UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PERRY VINCENT BRADLEY,

          Plaintiff,

v.

RICHARD HALLSWORTH, *et al.*,

          Defendants.

_____/

Case No. 1:09-cv-1070

Hon. Robert J. Jonker

**REPORT AND RECOMMENDATION**

This is a civil rights action brought by a state prisoner pursuant to 42 U.S.C. § 1983. This matter is now before the court on motions for summary judgment filed by defendant Lange (docket no. 31) and defendants Heebsch, Jenkins and Lacy (docket no. 55), both of which have been remanded to the undersigned for further consideration. The court will also address a subsequently filed motion for summary judgment filed by defendants Squier and McQueen (docket no. 77).

    **I.**      **Background**

Plaintiff's amended complaint alleged that he received inadequate treatment for a hernia and that he had interruptions in his cardiac medication (sometimes referred to as "hypertension medication" or "blood pressure medication"). Plaintiff is incarcerated with the Michigan Department of Corrections (MDOC) and housed at the Lakeland Correctional Facility (LCF). He named ten defendants in this action: Prison Health Services (PHS) President and CEO Richard Hallworth; Correctional Medical Services, Inc. (CMS) President and CEO Richard H. Miles; PHS Regional Medical Director Dr. Sylvia McQueen; PHS Dr. Harriet Squier;[1] MDOC Chief

_____

[1] Plaintiff sometimes refers to Dr. Squier as Dr. "Squire."

Medical Officer Dr. George Pramstaller; CMS Medical Director Dr. Craig Hutchinson; CMS Utilization Manager Dr. Eddie Jenkins; LCF Physician Assistant (P.A.) Hope Heebsch; LCF Health Unit Manager (HUM) Nancy Lange; and LCF Supervising Physician Dr. Robert Lacy.

Plaintiff has set forth the following allegations with respect to his hernia condition. Plaintiff kited the LCF Health Service Department about a hernia in his groin area on November 13, 2008. Amend. Compl. at ¶ 1. Between November 13, 2008 and December 15, 2008, plaintiff was called out by Nurse Hobbs and evaluated by defendant P.A. Heebsch. *Id.* at ¶¶ 2-3. On December 1, 2008, P.A. Heebsch requested surgery to repair plaintiff's hernia within six weeks. *Id.* at ¶ 4. Defendant Dr. Jenkins denied the request on December 2nd. *Id.* at ¶ 4. On December 15th, P.A. Heebsch called out plaintiff and informed him that Dr. Jenkins had rejected the surgery because it did not meet the criteria, and gave plaintiff the option of medication or a hernia belt. *Id.* at ¶ 5. Plaintiff requested both and was given a prescription for Naproxin and told that a hernia belt would be ordered. *Id.* Plaintiff alleged that he grieved the denial of hernia surgery on December 19, 2008, in grievance LCF-2009-01-0014-28e ("14"). *Id*. at ¶ 7.

On February 2, 2009, plaintiff inquired about the hernia belt, which had not yet arrived. *Id.* at ¶ 8. On February 19th, plaintiff was called out to see P.A. Heebsch, who informed him that they were unable to find a hernia belt. *Id.* at ¶ 11. Plaintiff was given the option of an athletic supporter or an abdominal binder. *Id.* Plaintiff chose the abdominal binder and was given one at that time. *Id.* P.A. Heebsch also ordered Motrin for pain because the Naproxin was ineffective. *Id.*

2

On April 8th, N.P. Kirk submitted a second request for hernia surgery to PHS, which plaintiff identified as "the new network provider for the MDOC." *Id.* at ¶ 12.[2]  N.P. Kirk also prescribed meloxicam for pain.  *Id.*   On April 10th, defendant Dr. McQueen denied the second request for surgery and ordered the medical service provider to continue conservative treatment because the hernia was still reducible.  *Id.* at ¶ 13.  On June 4th, plaintiff wrote to health services, informing them that his hernia was getting bigger and making it harder to have bowel movements. *Id.* at ¶ 14.  On June 8th, Nurse Joy Parrish called plaintiff out and gave him medication to help with the constipation and scheduled him to see the physician assistant.  *Id.*   He was seen by N.P. Kirk on June 10th.  *Id.* at ¶ 16.  N.P. Kirk informed plaintiff that MDOC Chief Medical Officer, Dr. Stieve, had e-mailed her that a source had been found for the hernia belt.  *Id.*  On July 14th, N.P. Kirk advised plaintiff that she was ordering him a hernia belt.  *Id.* at ¶ 17.  Plaintiff saw N.P. Kirk again on September 4th to request pain medication.  *Id.* at ¶ 18.  At that time, N.P. Kirk informed plaintiff that his request for a hernia belt had been denied .  *Id.*   N.P. Kirk also examined plaintiff and found that the hernia had grown to baseball size, causing plaintiff constant pain and impairing his ability to walk.  *Id.*[3]  Kirk told plaintiff that she was going to submit another request for surgery at PHS and to issue a request for pain medication to the pain medication committee.  *Id.*  On September 11th, Dr. Squier denied the request for surgery stating that as long as the hernia was reducible, surgery was not indicated.  *Id.* at ¶ 19.

---

[2] While plaintiff's complaint refers to "P.A. Kirk," the record reflects that this individual, Suzanne Kirk (not a party to this litigation) is a nurse practitioner (N.P.).

[3] The court notes that the medical records do not refer to the hernia as "baseball size."  Rather, the hernia was described at that time as the size of an egg.  *See* discussion, *infra*.

Plaintiff's second medical claim arises from health services' alleged failure to refill his cardiac medication until after his supply ran out. Plaintiff alleged that on December 15, 2008, he noticed that he had only a three or four day supply of cardiac medication. *Id.* at ¶ 6. He kited the health services to inform them that his medication was running out and asked for a refill before it ran out. *Id.* After sending "several kites" plaintiff ran out of medication and had none "for several days." *Id.*[4] Plaintiff allegedly filed a grievance with respect to the medication on December 20, 2008, in grievance LCF-2009-01-0044-28e ("44"). *Id.* at ¶ 7. Plaintiff also alleged that he was without cardiac medication for three days (February 7, 8 and 9, 2009) and that he filed another grievance on February 9, 2009, in grievance LCF-2009-02-168-28i ("168"). *Id.* at ¶ 10. He received the medication on February 10, 2009. *Id.*

With respect to his first claim, plaintiff alleged that defendants Hallworth, Miles and Dr. Hutchinson failed "to curb the known rule, custom or practice" of Dr. Jenkins in denying plaintiff's hernia surgery. *Id.* at ¶ 22. He alleged that defendants Dr. McQueen, Dr. Jenkins and Dr. Squier were deliberately indifferent to his serious medical needs "in refusing [p]laintiff's surgery request." *Id.* at ¶ 23. In addition, defendant P.A. Heebsch demonstrated deliberate indifference to his serious needs by failing to appeal Dr. Jenkins' the denial of surgery. *Id.* at ¶ 24. Finally, plaintiff alleged that defendants Dr. Pramstaller's and Dr. Lacy's failure to authorize surgery to repair his hernia constituted deliberate indifference. With respect to his second claim, plaintiff alleged that defendant HUM Lange was deliberately indifferent in failing "to follow a protocol in

---

[4] Plaintiff's medical records establish that he sent a kite requesting a renewal of his blood pressure medicine (Norvasc) on December 19, 2008. MDOC Medical Records at p. 58 (docket no. 59). On December 22nd, plaintiff sent a kite stating that he was out of Norvasc. *Id.* at p. 59. On December 26th, plaintiff was instructed to come to the medlines to get the medication until it was available from Pharmacor. *Id.*

the delivery of [plaintiff's] hypertension medication." *Id.* at ¶ 26.[5]  Plaintiff seeks declaratory relief, injunctive relief, compensatory damages and punitive damages.

After screening the amended complaint, the court dismissed plaintiff's action against defendants Hallworth, Miles, Dr. Pramstaller and Dr. Hutchinson without prejudice for failure to state a claim upon which relief may be granted pursuant to 28 U.S.C. §§ 1915(e) and 1915A, and 42 U.S.C. § 1997e(c).  *See* Order for Partial Service (docket no. 9).

The court originally recommended that defendants HUM Lange, P.A. Heebsch, Dr. Jenkins and Dr. Lacy be granted summary judgment for lack of exhaustion.  *See* Report and Recommendation (docket no. 74).  In his objections, plaintiff presented new evidence suggesting that he had exhausted the claims these four defendants.  In light of this new evidence, the district court remanded the motions to this court for consideration of the alternative arguments raised by defendants in support of their motions for summary judgment.  *See* Order Rejecting Report and Recommendation (docket no. 81).  Accordingly, this report will address those alternative arguments raised by defendants HUM Lange, P.A. Heebsch, Dr. Jenkins and Dr. Lacy in their motions for summary judgment.  *See* docket nos. 31 and 55.  The court will also address a separate motion for summary judgment filed by defendants Dr. Squier and Dr. McQueen.  *See* docket no. 77.

## II.    Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

---

[5] The court notes that while plaintiff directed a grievance against Dr. Lacy with respect to the hypertension medication, he did not allege a cause of action against the doctor with respect to the delivery of the medication.

Fed. R. Civ. P. 56(a).   Rule 56 further provides that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by":

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in deciding a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case.  Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment.  The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted).  "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party."  *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).  However, the court is not bound to blindly adopt a non-moving party's version of the facts.  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### III.  Failure to exhaust as to Dr. Squier and Dr. McQueen

### A.  Exhaustion requirement

The Prison Litigation Reform Act ("PLRA") 42 U.S.C. § 1997e, provides that a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983 must first exhaust available administrative remedies.  *See Porter v. Nussle*, 534 U.S. 516 (2002); *Booth v. Churner*, 532 U.S. 731 (2001).  A prisoner must exhaust available administrative remedies, even if the prisoner may not be able to obtain the specific type of relief he seeks in the state administrative process. *See Porter*, 534 U.S. at 520; *Booth*, 532 U.S. at 741.  In order to properly exhaust administrative remedies, prisoners must complete the administrative review process in accordance with the deadlines and other applicable procedural rules.  *Jones v. Bock*, 549 U.S. 199, 218 (2007); *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006). "Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.' " *Jones*, 549 U.S. at 218.

### B.  MDOC grievance process

The MDOC requires prisoners to follow a three-step process to exhaust grievances. *See* Policy Directive 03.02.130 (effective July 9, 2007).  A prisoner must first attempt to resolve a problem with the staff member within two business days of becoming aware of the grievable issue, unless prevented by circumstances beyond his or her control.  If the issue is not resolved, then the grievant may file a Step I grievance on the prescribed form within five business days after the grievant attempted to resolve the issue with appropriate staff.   The Policy Directive provides the following directions for completing grievance forms:

> The issues shall be stated briefly but concisely.  Information provided is to be limited to the <u>facts</u> involving the issue being grieved (i.e., who, what, when, where, why, how).  Dates, times, places and names of all those involved in the issue being grieved are to be included.

*Id.* at ¶ R (emphasis in original).   The prisoner must send the Step I grievance to the appropriate grievance coordinator.   If the prisoner is dissatisfied with the Step I response, or does not receive a timely response, he must request the appropriate form and send it to the Step II Grievance Coordinator.   Finally, if a prisoner is dissatisfied with the Step II response, or does not receive a timely response, he must send a completed Step III grievance, using the appropriate form, to the appropriate MDOC official.

### C.   Plaintiff's grievances pursued through Step III

The record reflects that plaintiff appealed grievances 14, 44 and 168 through Step III. *See* Grievances 14, 44 and 168; MDOC Step III Grievances by Prisoner (docket no. 32-6).

### 1.   Grievance no. 14

Grievance no. 14 complained about the inadequate treatment for plaintiff's hernia, including his need for surgery, naming five individuals: former defendants Dr. Pramstaller and Dr. Hutchinson; Dr. Jenkins; P.A. Heebsch; and HUM Lange.  *Id.*  *See* Grievance no. 14.   This grievance is dated December 19, 2008, and lists the "Date of Incident" as December 15, 2008.  *Id.*

### 2.   Grievance no. 44

Grievance no. 44 also bears an incident date of December 15, 2008.   Grievance no. 44 grieved the failure of Dr. Lacy and HUM Lange to adequately provide him with medication for his high blood pressure, seeking "more than $10,000 each" from them.  *See* Grievance no. 44. Plaintiff stated that when he spoke with P.A. Heebsch about this matter on December 15th, she could not provide an explanation for the omission in ordering the high blood pressure medicine.  *Id.*  While plaintiff attempted to resolve this grievance with P.A. Heebsch, this grievance appears directed at Dr. Lacy and HUM Lange, the two individuals from whom plaintiff sought money.  *Id.*

8

### 3.   Grievance no. 168

Grievance no. 168 involves the purported failure of two medical personnel, specifically Dr. Lacy and HUM Lange, "to have a system in place that monitors and informs them that my blood pressure medication will expire within a specific amount of days, necessitating renewal." *See* Grievance no. 168. This grievance is dated February 9, 2009, and lists the "Date of Incident" as February 6, 2009. *Id.*

### 4.   Failure to name Dr. Squier or Dr. McQueen

Policy Directive 03.02.130 ¶ R requires that "[d]ates, times, places and names of all those involved in the issue being grieved are to be included." None of the three grievances at issue in this litigation (nos. 14, 44 and 168), name either Dr. Squier or Dr. McQueen as required by the policy directive. By failing to name Dr. Squier or Dr. McQueen in a grievance, plaintiff has failed to properly exhaust a grievance against these two physicians in accordance with the applicable procedural rules. *See Jones*, 549 U.S. at 218; *Woodford*, 548 U.S. at 90-91. Accordingly, defendants Dr. Squier and Dr. McQueen are entitled to summary judgment for lack of exhaustion.

### IV.   Eighth Amendment claim for deliberate indifference

Plaintiff seeks relief pursuant to 42 U.S.C. § 1983, which confers a private federal right of action against any person who, acting under color of state law, deprives an individual of any right, privilege or immunity secured by the Constitution or federal laws. *Burnett v. Grattan*, 468 U.S. 42, 45 n. 2 (1984); *Stack v. Killian*, 96 F.3d 159, 161 (6th Cir.1996). To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

It is well established that an inmate has a cause of action under § l983 against prison officials for "deliberate indifference" to his serious medical needs, since the same constitutes cruel and unusual punishment proscribed by the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97 (l976). A viable Eighth Amendment claim consists of an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A court considering a prisoner's Eighth Amendment claim must ask both if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation and if the officials acted with a sufficiently culpable state of mind. *Hudson v. McMillian*, 503 U.S. 1, 8 (1992).

The objective component requires the infliction of serious pain or failure to treat a serious medical condition. *Hudson*, 503 U.S. at 8-9. With respect to the infliction of serious pain, courts recognize that "[b]ecause routine discomfort is part of the penalty that criminal offenders pay for their offenses against society, only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Id.* at 8 (internal citations and quotation marks omitted). Similarly, "[b]ecause society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Id.* at 9.

The subjective component requires that the defendant act with deliberate indifference to an inmate's health or safety. *See Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991). To establish the subjective component, the plaintiff must show that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Mere negligence in diagnosing or treating a medical condition

does not constitute an Eighth Amendment violation. *Id.* at 835. "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishment Clause." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

### A. Plaintiff's claims against Dr. Squier, Dr. McQueen, Dr. Lacy, Dr. Jenkins and PA Heebsch.

### 1. Treatment by Dr. Squier and Dr. McQueen (docket no. 77)

Plaintiff alleged that Dr. Squier and Dr. McQueen acted with deliberate indifference "in refusing Plaintiff's surgery to repair his hernia." Amend. Compl. at ¶ 23. As previously discussed, these two doctors are entitled to summary judgment due to lack of exhaustion. Even if plaintiff had exhausted his claims against Drs. Squier and McQueen, the doctors are entitled to summary judgment on the merits.

Dr. McQueen is a physician employed by PHS. McQueen Aff. at ¶ 2 (docket no. 77-3). From April 1, 2009 through September 18, 2010, Dr. McQueen held the position of State Medical Director for PHS in Michigan. *Id.* Dr. McQueen's duties included reviewing requests for outside consultations for inmates incarcerated with the MDOC. *Id.* Dr. McQueen's only involvement with plaintiff was that the doctor received a request dated April 8, 2009, to authorize a surgical consult for plaintiff's hernia. *Id.* at ¶ 3. On April 15, 2009, Dr. McQueen recommended that, instead of surgery, plaintiff receive conservative treatment for this condition. *Id.* at ¶ 4. Dr. McQueen explained her decision for recommending conservative treatment as follows:

> [Plaintiff's] hernia at that time did not require surgery. A hernia requires surgery when it will not 'reduce' or be physically manipulated to return to its original position. A hernia will also require surgery when there is incarceration and or strangulation: tissue is entrapped by the hernia and begins to lose blood flow. In [plaintiff's] case, the hernia remained reducible and did not cause incarceration and strangulation.

11

*Id.* at ¶ 4. Dr. McQueen further stated that the recommendation for conservative treatment "is not a final determination that forecloses the possibility of surgery permanently," because hernias may worsen over time. *Id.* at ¶ 5. If plaintiff's condition worsens, the hernia will be re-assessed and surgery authorized if medically needed. *Id.* Finally, Dr. McQueen stated that the decision to recommend conservative treatment was based on her professional judgment of plaintiff's clinical presentation at the time of the request for this elective surgery. *Id.* at ¶ 6.

Dr. Squier, also a physician employed by PHS, occasionally reviews requests for consults with outside medical professionals for inmates incarcerated at the MDOC. Squier's Aff. at ¶ 2 (docket no. 83-3). Dr. Squier received a request dated September 11, 2009, seeking a surgical consultation for plaintiff's right inguinal hernia. *Id.* at ¶ 3. Dr. Squier determined that surgery was not appropriate under the MDOC's guidelines because plaintiff's hernia was reducible, i.e., "the hernia could be physically manipulated to return to its original position." *Id.* at ¶ 4. In her opinion, application of the MDOC's guideline was appropriate and within the standard of care for the following reasons:

> The hernia was reducible and there were no other indicia requiring surgical intervention, such as strangulation, incarceration, or that the hernia extended into the scrotum. In addition, [plaintiff] has been closely monitored for symptoms of gastrointestinal distress such as lack of bowel movement, vomiting and abdominal pain which would indicate that the hernia is impinging on [plaintiff's] intestines. This also would require surgical intervention.

*Id.* Instead of surgery, Dr. Squier recommended that plaintiff receive conservative treatment "to address the hernia and his complaints of pain, such as proper lifting techniques, care to avoid constipation, scrotal support and medication." *Id.* at ¶ 5. Dr. Squier further stated that plaintiff's hernia condition has been stable since September 2010. *Id.* at ¶ 7.

Plaintiff's claims against these two doctors are based upon decisions made on April 15, 2009 (Dr. McQueen) and September, 11, 2009 (Dr. Squier) to pursue a conservative course of treatment for plaintiff's hernia. Plaintiff's medical records reflect that he received constant medical care for his hernia from the time he first presented with hernia symptoms on December 1, 2008 through March 7, 2010.[6]  *See* LRF medical records (docket no. 59 at pp. 44-151).  Specifically, plaintiff's medical records generated prior to the operative dates of April 15, 2009 and September 11, 2009 do not reflect that he suffered from complications such as strangulation, incarceration or extension into the scrotum.  *See* LRF medical records (4/8/09) (docket no. 59 at pp. 80-86); LRF medical records (9/4/09) (docket no. 59 at pp. 117-22).  Based on plaintiff's medical condition, and in the absence of complications, the medical providers exercised their medical judgment in determining that plaintiff did not require surgery.

Viewing the evidence in the light most favorable to plaintiff, the record reflects that plaintiff received constant, conservative medical treatment for his hernia.  The fact that Drs. Squier and McQueen denied requests for a surgical consultation is a matter of medical judgment which does not rise to a federal constitutional violation.  "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law."  *Westlake v. Lucas*, 537 F.2d 857, 860 n. 5 (6th Cir. 1976).  Courts have determined that a physician's decision to treat a prisoner's hernia, including the decision to perform corrective surgery, is a matter of medical judgment which does not give rise to a federal constitutional violation.  *See, e.g., Winslow*

---

[6] The court notes that the records provided by defendants reflect that he received hernia treatment for several months after he filed this action on November 23, 2009.

*v. Prison Health Services*, 406 Fed. Appx. 671 (3rd Cir. 2011) (prison doctors did not act with deliberate indifference to prisoner's medical needs by deciding to forego surgery in treatment of prisoner's hernia, even though doctors considered the cost of the procedure in declining surgery, where the prisoner's hernia was not strangulated or incarcerated and the doctor stated that the standard treatment for an inguinal hernia was non-surgical, and that with proper treatment the hernia could heal without surgical intervention); *Palazon v. Secretary for Department of Corrections*, 361 Fed. Appx. 88, 89-90 (11th Cir. 2010) (where medical records indicated that a prisoner's hernia was treatable without surgery, defendant state prison officials were not deliberately indifferent for making decision not to perform surgery; this case presented a classic "matter of medical judgment" which is not an appropriate basis for a federal Eighth Amendment claim).

       In addition, while plaintiff disagreed with the conservative treatment prescribed by these doctors, and expressed his desire for hernia surgery, this disagreement cannot form the basis for a federal constitutional claim. A prisoner's disagreement with a course of medical treatment does not state a federal constitutional claim under the Eighth Amendment. *See Smith v. Marcantonio*, 910 F.2d 500, 502 (8th Cir. 1990). *See also*, *Day v. Lantz*, 360 Fed. Appx 237, 237-39 (2nd Cir. 2010) (prison doctors were not deliberately indifferent to the prisoner's serious medical needs where the evidence showed that the prisoner's inguinal hernia was timely diagnosed and properly treated without surgery; although the prisoner refused surgery, the court also dismissed his claim on grounds that his complaint was "founded upon a disagreement over the proper treatment for his inguinal hernia, which does not give rise to a constitutional claim"); *Woodberry v. Simmons*, 146 Fed.Appx. 976, 977 (10th Cir. 2005) ("a difference of opinion between a prisoner and the prison medical staff about medical treatment does not constitute deliberate indifference"); *Chance v.*

*Armstrong*, 143 F.3d 698, 703 (2nd Cir. 1998) ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation").

As the court observed in *Alexander v. Federal Bureau of Prisons*, 227 F. Supp. 2d 657 (E.D. Ky. 2002):

> While it appears that the plaintiff has not gotten what he wants, what he wants is not the issue. Ordering a specific type of surgery is not the appropriate function of this Court. The Court agrees with the defendants that, at most the plaintiff has alleged a difference in opinion between the plaintiff and his health care providers regarding the expediency of a specific treatment. This does not generally create a constitutional claim. *See Tolbert v. Eyman*, 434 F.2d 625 (9th Cir.1970); *Byrd v. Wilson*, 701 F.2d 592 (6th Cir.1983).

*Alexander*, 227 F. Supp. 2d at 666. "Mere differences of opinion among medical personnel regarding a patient's appropriate treatment do not give rise to deliberate indifference." *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261 (7th Cir. 1996).

Defendants Dr. McQueen and Dr. Squier are entitled to summary judgment on plaintiff's claims asserted against them.

### 2. Treatment by Dr. Lacy, Dr. Jenkins and P.A. Heebsch (docket no. 55)

Plaintiff alleged that Dr. Lacy acted with deliberate indifference to by "failing to provide for repair of Plaintiff's hernia." Amend. Compl. at ¶ 25. Similarly, plaintiff alleged that Dr. Jenkins acted with deliberate indifference "in refusing Plaintiff's surgery to repair his hernia," that his "refusal of Plaintiff's surgery request constituted deliberate indifference to the Plaintiff's serious medical needs," and that PA Heebsch was deliberately indifferent "for failure . . . to appeal" Dr. Jenkins' "refusal" of the surgery request. *Id.* at ¶¶ 23-24. The gist of plaintiff's claims

against these three medical providers is that they violated plaintiff's Eighth Amendment rights when they failed or refused to perform hernia surgery.  Defendants contend that plaintiff cannot maintain an Eighth Amendment action against them because plaintiff's claim involves a dispute over a matter of medical judgment.  Defendants' Brief at pp. 6-9 (docket no. 55).

Medical records submitted by these defendants reflect as follows.  P.A. Heebsch saw plaintiff on December 1, 2008, with complaints of abdominal pain and bulging which was "easy to 'push down.'"  LCF physical exam (12/1/08) (docket no. 59 at p. 45).  P.A. Heebsch's examination revealed "a small, fingertip, tender right inguinal hernia."  *Id.*  As a result, the P.A. ordered a bottom bunk assignment and submitted a consultation request to "[e]valuate and treat small right inguinal hernia."  Consultation Request (12/1/08) (docket no. 59 at pp. 48-49).

On December 2, 2008, Dr. Jenkins reviewed the consultation request and determined that a "general surgery consult" was not authorized.  *Id.* (docket no. 59 at pp. 50-51).

On December 10, 2008, plaintiff failed to appear for a scheduled appointment with the medical service provider, stating that he "forgot."  LCF progress note (12/10/08) (docket no. 59 at pp. 53-54).  The appointment was rescheduled and plaintiff was issued a major misconduct.  *Id.*

On December 15, 2008, P.A. Heebsch met with plaintiff to discuss his hernia surgery authorization.  LCF physical exam (12/15/08) (docket no. 59 at p. 55).  Plaintiff was "not pleased about the decision," and requested pain medication and a hernia belt.  *Id.*

On February 2, 2009, plaintiff requested the hernia belt.  LCF kite response (2/9/09) (docket no. 59 at p. 63).  The responding nurse noted that she found the order for the hernia belt and would check with the person in charge of ordering medical equipment.  *Id.*

On February 12, 2009, P.A. Heebsch ordered a follow-up visit to determine if an "abd binder" (i.e., abdominal binder) or scrotal support was appropriate. Orders Summary (2/12/09) (docket no. 59 at p. 64).

On February 19, 2009, P.A. Heebsch examined plaintiff and discussed choosing either an abdominal binder or scrotal support. LCF physical exam (2/19/09) (docket no. 59 at p. 68). Plaintiff had more pain in his inguinal area, agreed to try an abdominal binder, and requested pain medication. *Id.* P.A. Heebsch issued a Special Accommodation Notice (SAN) for issuance of an abdominal binder that day. SAN (2/19/09) (docket no. 59 at p. 67). A progress note reflects that the abdominal binder was issued the next day. LCF progress note (2/20/09) (docket no. 59 at p. 71).

On September 4, 2009 N.P. Suzanne Kirk examined plaintiff and requested a general surgery consultation related to a presumed diagnosis of a right inguinal hernia. LCF physical exam (9/4/09) (docket no. 59 at pp. 117-20); Consultation Request (9/4/09) (docket no. 59 at pp. 121-22). N.P. Kirk described the signs and symptoms as follows:

> This patient states that for the past year he had increasingly severe right inguinal pain with intermittent bulging upon standing. Initially, hernia was small & easily reduced. Now bigger, harder to reduce,. He denies recent change in his bowel or bladder habits. He has stopped lifting weights. Pt has tried regular doaing [sic] of naprosyn and motrin for pain which he reports does not help. PATIENT IS SERVING LIFE SENTENCE.

Consultation Request (9/4/09) (docket no. 59 at p. 121). The supporting physical examination included the following findings:

> R inguinal hernia is egg sized, prominent w/standing, able to reduce with effort when lying. Tender on manipulation. [D]istant bowel sounds appreciated. Hernia not appreciated in scrotal region.

*Id.*

On October 8, 2009, Dr. Lacy examined plaintiff at the request of N.P. Kirk. SOAP note summary (10/8/09) (docket no. 59 at p. 127). Dr. Lacy looked at the hernia, concurred that "repair now could prevent further enlargement, reduced discomfort and ability to continue health lifestyle that includes exercise." *Id.* Dr. Lacy and N.P. Kirk agreed to appeal the no surgery decision. *Id.*

### a.    Dr. Lacy and P.A. Heebsch

Viewing this evidence in the light most favorable to plaintiff, the court concludes that plaintiff's claims against P.A. Heebsch and Dr. Lacy are without merit. Neither P.A. Heebsch nor Dr. Lacy were deliberately indifferent to plaintiff's serious medical needs. Rather, these two defendants took steps to treat his hernia: P.A. Heebsch requested a surgical consultation and obtained abdominal support equipment; and Dr. Lacy opined that plaintiff could benefit from surgery and assisted N.P. Kirk in appealing a "no surgery" decision. There is no evidence to support plaintiff's claim that these defendants were deliberately indifferent to his medical condition. *See, e.g., Stringer v. Indiana Department of Corrections*, No. 3:08-cv-567, 2010 WL 1462343 at *6 (N.D. Ind. April 8, 2010) (there were no facts in the record from which a reasonable fact-finder could conclude that the defendant doctor deliberately disregarded the prisoner's hernia and refused him treatment, where the record reflected that the doctor saw the prisoner several times, examined him, treated him conservatively for his hernia, prescribed pain medication, and wrote surgery consults). Accordingly, Dr. Lacy and P.A. Heebsch should be granted summary judgment with respect to plaintiff's claims.

b.      **Dr. Jenkins**

The medical records before the court do not reflect Dr. Jenkins' reasons for denying the surgery consultation. Unlike Dr. Squier and Dr. McQueen, Dr. Jenkins did not provide an affidavit setting forth the specific reasons for denying the surgery consultation in October 2009. Nevertheless, plaintiff's claim fails. Viewing the evidence in the light most favorable to plaintiff, the record reflects that plaintiff received constant, conservative medical treatment for his hernia. As with Drs. Squier and McQueen, the fact that Dr. Jenkins denied a request for a surgical consultation is a matter of medical judgment which does not rise to a federal constitutional violation. *See Winslow*, 406 Fed. Appx. 671; *Palazon*, 361 Fed. Appx. at 89-90. This court should not second guess the medical judgments of prison medical providers for the purposes of creating federal constitutional issues out of state law torts. *See Westlake*, 537 F.2d at 860 n. 5. Dr. Jenkins actions must be viewed in light of the entire medical record. He was undoubtably aware that other doctors and medical personnel had been examining and treating plaintiff, and his judgment, though perhaps different than others, must be viewed in that context. When multiple medical personnel treat a patient, each need not perform all the examinations and treatments others have. They may make their decisions based on what others have already done and the examinations others have conducted. Doctors treating the same patient (not unlike a panel of appellate judges reviewing the same appeal) may not always concur about how to best treat that patient. Dr. Jenkins decision reflects a difference of medical judgement concerning plaintiff's medical condition, not a disregard of it. Furthermore, plaintiff's own disagreement with Dr. Jenkins regarding the need for hernia required surgery does not give rise to a federal constitutional claim. *See Day*, 360 Fed. Appx at 237-39; *Woodberry*, 146 Fed. Appx. at 977; *Chance*, 143 F.3d at 703; *Estate of Cole by Pardue*, 94 F.3d at 261; *Smith*, 910

F.2d at 502; *Alexander*, 227 F. Supp. 2d at 666.  Accordingly, Dr. Jenkins' motion for summary judgment should be granted.

### B.    HUM Lange

Plaintiff's amended complaint does not allege any wrongdoing on the part of HUM Lange, other than to identify her in his "second cause of action" as the correctional facility's HUM and assert that she "failed to follow protocol in the delivery of [his] hypertension medication," and that the "[a]brupt withdrawal of this medication may cause this condition to become worse." Amend. Compl. at ¶ 26.  Plaintiff does not identify any "protocol" violation or any particular wrongful conduct by HUM Lange directed at him.  "It is not enough for a complaint under § 1983 to contain mere conclusory allegations of unconstitutional conduct by persons acting under color of state law. Some factual basis for such claims must be set forth in the pleadings." *Chapman v. City of Detroit*, 808 F.2d 459, 465 (6th Cir.1986).  In this regard, plaintiff does not allege any personal involvement by HUM Lange in his medical treatment.  It is well settled that a § 1983 action cannot be based on a theory of respondeat superior.  *See Monell v. New York City Dep't. of Social Services*, 436 U.S. 658, 691 (1978); *Taylor v. Michigan Dep't. of Corrections*, 69 F.3d 76, 80-81 (6th Cir. 1995).  A supervisor's liability under § 1983 cannot attach where the allegation of liability is based upon a mere failure to act.  *Salehpour v. University of Tennessee*, 159 F.3d 199, 206 (6th Cir. 1998). In order to hold a supervisor liable under § 1983, "[t]here must be a showing that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it." *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984).  Plaintiff has neither alleged, nor demonstrated, HUM Lange personal involvement in his medical care with respect to his

hypertension medication.  Accordingly, HUM Lange is entitled to summary judgment with respect to plaintiff's claims against her.

### V.    Recommendation

For the reasons set forth above,  I respectfully recommend that the motions for summary judgment filed by HUM Lange (docket no. 31), P.A. Heebsch, Dr. Jenkins and Dr. Lacy (docket no. 55), and Dr. Squier and Dr. McQueen (docket no. 77) be **GRANTED** and that this action be dismissed.

Dated:  August 19, 2011                          /s/ Hugh W. Brenneman, Jr.
                                                 HUGH W. BRENNEMAN, JR.
                                                 United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report.  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).